IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:26-CR-148-KAC-JEM |
| | ) | |
| TYLER SHANE WELLS,<br>ALEXANDER BONILLA-SERVIN,<br>OMAR BONILLA-SERNA | )<br>)<br>) | |
| | ) | |
| Defendants, | ) | |

**REPORT AND RECOMMENDATION**

This case is before the Court for report and recommendation on Defendant Tyler Wells's Motion to Dismiss for Violations of the Due Process and Compulsory Process Clauses [Doc. 113]. Defendants Alexander Bonilla-Servin [Doc. 119] and Omar Bonilla-Serna [Doc. 160] move to adopt this motion.

Defendants Wells, Bonilla-Servin, and Bonilla-Serna are charged with conspiring with Defendant Nicholas Foy Pastor and others known and unknown to "conceal, harbor, and shield from detection" in buildings and other places for the purpose of commercial advantage and private financial gain, six aliens, while "knowing and in reckless disregard of the fact that" the aliens had illegally entered and remained in the United States, all in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), (a)(1)(A)(v)(I), and (a)(1)(B)(i) (Count One) [Doc. 73 p. 1]. The Superseding Indictment also alleges that Defendants Wells, Bonilla-Servin, and Bonilla-Serna, along with Defendant Pastore, aided and abetted each other in six counts of concealing, harboring, and shielding from detection six illegal aliens "in buildings and other places for the purpose of commercial advantage and

private financial gain in violation of 8 U.S.C. § 1324(a)(1)(A)(iii)[ and] (a)(1)(B)(i)," (Counts Four–Nine) [*Id*. at 4–7].[1]

Defendants ask the Court to dismiss the indictment because the Government has deported or voluntarily removed from the United States the material witnesses listed as Individuals 1–6 in Counts One and Four through Nine [Doc. 113 p. 1]. Defendants argue that the Government's action in deporting and removing these witnesses violates their Fifth Amendment right to due process and Sixth Amendment right to compulsory process because it deprives them of the right to interview eyewitnesses to the alleged offenses [*Id*. at 3]. Defendants assert that the Government acted in bad faith in deporting or removing Individuals 1–6 because it was aware these witnesses are material to this case prior to their deportation or removal [*Id*. at 4–5]. They contend that the witnesses would have provided testimony that is both favorable and material to their defenses [*Id*. at 6–9].

The undersigned finds Defendants have not shown that the prosecution acted in bad faith in failing to secure the testimony of Individuals 1–6. Accordingly, the undersigned respectfully recommends that the District Judge **GRANT** Defendants Bonilla-Servin's [Doc. 119] and Bonilla-Serna's [Doc. 160] motions to join in the motion to dismiss and **DENY** Defendants' joint motion to dismiss alleging violations of due process and compulsory process [Doc. 113].

[1] The Superseding Indictment also charges Defendants Wells, Bonilla-Servin, and Bonilla-Serna with conspiring with each other and others known and unknown to prevent federal officers from lawfully discharging their duties, to injure federal officers on account of and while engaged in their official duties, and to injure the property of federal officers to impede them in the discharge of their official duties, all in violation of 18 U.S.C. § 372 (Count Three) [*Id*. at 2–4]. Defendant Bonilla-Servin is solely charged with "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], and interfere[ing]" with federal officers in the performance of their official duties by using his vehicle to strike the officers' vehicle in violation of 18 U.S.C. § 111(b) (Count Two) [Doc. 73 p. 2]. These two counts are not expressly implicated in the motion to dismiss [Doc. 113] although Defendants ask to dismiss the Superseding Indictment, rather than specific counts.

## I. BACKGROUND AND POSITIONS OF THE PARTIES

As set out above, Defendants Wells, Bonilla-Servin, and Bonilla-Serna are charged with conspiring to harbor illegal aliens, referenced as Individuals 1–6, and with six counts of harboring and aiding and abetting each other in harboring six illegal aliens, also listed as Individuals 1–6 [*See* Doc. 73]. Defendant Wells was arrested and first appeared before the undersigned on January 23, 2026 [Doc. 19, Minutes; *see* Doc. 25 p. 1]. The Court held a detention hearing on January 27, 2026 [Doc. 29, Minutes]. The Government argued that Defendant Wells presented a serious risk of obstruction of justice because he "is highly likely to affirmatively assist in concealing material witnesses from law enforcement" [Doc. 27 p. 5]. "At [Defendant Wells's detention] hearing, the Government articulated that the dangers here from Defendant's release relate to Defendant further obstructing justice, including by threatening or intimidating prospective witnesses in this case and ongoing investigation, and his willingness and determination to thwart immigration investigations through alerting illegal aliens of investigations and instructing them to disperse, which leads to danger to the community" [Doc. 33-1, Detention Order Part II, p. 3]. The undersigned detained Defendant Wells pending trial [*Id*. at 5].

On April 30, 2026, Defendant Wells filed a Motion to Dismiss for Violations of the Due Process and Compulsory Process Clauses [Doc. 113]. He asserts that he is charged with harboring and conspiring to harbor Individuals 1–6 and, thus, the immigration status of these individuals, and [his] knowledge of them and relationship with them are central to the allegations and the defense" [*Id*. at 1]. He contends that the Government provided discovery to defense counsel on January 29, 2026, which contained only a "short one-and-a-half page summary" relating to Individuals 1–6 showing that none of the arrestees worked for him or his company [*Id*. at 2, 6]. He maintains that approximately six weeks later, on March 16, 2026, the Government produced the

"A Files" for Individuals 1–6, which state that Individuals 1–6 were deported or assisted in making a "voluntary departure" by February 23, 2026, with the first being granted voluntary departure three days after the January 27 detention hearing [*Id*. at 2, 5–6].

Defendant Wells questions whether the current test for a compulsory process violation set forth in *United States v. Damra*, 621 F.3d 474, 489–90 (6th Cir. 2010), comports with that previously imposed by the Supreme Court in *United States v. Valezuela-Bernal*, 458 U.S. 858, 871 (1982). *Damra* requires a defendant first to show the government acted in bad faith in deporting a witness, and second, having shown bad faith, to show the deported witness's testimony is both material and favorable to his defense [*Id*. at 3 (citing 621 F.3d at 489–90)]. But Defendant Wells contends he can show a violation under either test [*Id*. at 2–3].

Regarding the Government's bad faith, Defendant Wells maintains that the Government's removal of Individuals 1–6 violates his due process and compulsory process rights because it knew the witnesses had information material to his defense prior to removing them [*Id*. at 4, 6]. He points out that, at the detention hearing, the prosecutor repeatedly referred to the allegedly harbored individuals as "material witnesses" and stated that he (Wells) would likely raise as a defense that he did not know the witnesses were in the country illegally [*Id*. at 5–7; *see also* Doc. 37, Transcript, pp. 7–8, 16, 25, 36]. Defendant also argues that he can plausibly show Individuals 1–6 could provide testimony that is material and favorable to his defense [Doc. 113 pp. 6–9]. He states that in its Order of Detention, the undersigned acknowledged that the workers on the jobsite were "relevant witnesses" [*Id*. at 7 (emphasis omitted); Doc. 33-1 p. 5]. He contends that "[t]he identities and legal status of each individual [allegedly harbored] are essential elements of the charged offenses" and that two of Individuals 1–6 used aliases [Doc. 113 p. 8]. He also maintains that "[i]f

the six were to testify, they would testify that . . . they did not work for [him] directly" and "could also refute an allegation that [he] drove one or more of them to a hotel" [*Id*. at 8–9].

Both Defendant Bonilla-Servin [Doc. 119] and Defendant Bonilla-Serna [Doc. 160] moved to join in this motion stating the arguments therein also apply to them.

The Government responds in opposition, asserting that the Sixth Circuit's test in *Damra* controls and that Defendant Wells can show neither bad faith nor that the testimony of Individuals 1–6 would have been material and favorable to him [Doc. 129 p. 1]. It maintains that Defendant cannot show bad faith because it "did not deport illegal aliens to silence them" [*Id*. at 3]. Instead, several of the individuals were granted voluntary departure, which means the aliens put themselves beyond Defendant's reach [*Id*.]. It also points out that when aliens are granted voluntary departure and the United States consents or when the alien is deported, this is the work of a different agency (Immigration and Customs Enforcement ("ICE") through its Enforcement and Removal Operations ("ERO") branch) acting under a different statute than the prosecution in this case [*Id*. at 3–4]. It asserts that at the detention hearing, it argued the witnesses were material to its prosecution of the case, not to Defendant Wells's or any of his coconspirators' defenses [*Id*.]. The Government also contends the Court's finding that the witnesses were "relevant" to the detention issue does not mean that they are relevant to a defense [*Id*. at 5]. It maintains that, instead, "this case was part of the government's broad and sustained federal immigration enforcement effort" [*id*. at 6], and Defendant's conduct facilitated the escape of another twenty-four aliens (the ones who fled the construction site and were not arrested) preventing it from investigating and developing other charges [*id*. at 7].

The Government also contends that Defendant fails to make a plausible showing that the testimony of the departed aliens is favorable or material [*Id*. at 8]. It asserts that potential testimony

that Individuals 1–6 did not work for Defendant Wells directly is not material or favorable because the charges do not require direct employment [*Id.*]. It also argues that Wells's own text messages belie any assertion that he did not know of the workers' illegal alienage [*Id.* at 9 n.2]. The Government also maintains that the use of aliases by two of the witnesses is not material, nor favorable, when it has tracked Individuals 1–6 by name in the I-213 forms [*Id.* at 9]. It argues that although Defendant contends the testimony of Individuals 1–6 could refute that he drove them to a hotel, the charges "rest on a course of conduct documented in text messages, video footage, property records, and corroborating witness statements" [*Id.*]. The Government maintains that "speculative denial of a single trip" is not the "plausible showing" that *Damra* requires [*Id.* at 9–10]. Finally, the Government argues that the testimony of Individuals 1–6 is not necessary to prove their illegal alienage, which it intends to prove through "[p]ublic-records evidence," namely, "the I-213 forms and the rest of the A-File materials in discovery" [*Id.* at 10].

In reply, Defendant Wells argues that the Supreme Court stated in *Valenzuela-Bernal*, 458 U.S. at 871, and the Sixth Circuit echoed in *Damra*, 621 F.3d at 487, that "when a defendant does not have an opportunity to interview the witness before removal, the defendant does not have to provide a detailed description of how [he or she] would testify" [Doc. 135 pp. 1–2]. He argues that the Sixth Circuit departed from Supreme Court precedent when it required the bad faith prong in *Damra*, but he continues to assert that he can meet either test [*Id.* at 2].

Regarding bad faith, Defendant contends that voluntary departure and deportation are analyzed the same and that the Attorney General as head of the Department of Justice ("DOJ") directs both the prosecuting attorneys and oversees deportation and voluntary departure through the immigration court [*Id.* at 3]. He maintains that the duty to preserve evidence in a case is not limited to the prosecution but is imputed to all officers and agencies investigating the case [*Id.*].

Defendant asserts that before enforcing the immigration laws, the Government should have determined that Individuals 1–6 possessed no favorable evidence, and that the Government knew the importance of these witnesses from the beginning of the case because a Homeland Security agent interviewed them on "how they arrived to the construction site, who they worked for, and how they were paid" [*Id*. at 4–5].

Regarding the plausible showing prong, Defendant contends that the Government's arguments go to the weight of the evidence, but he "is entitled to obtain and present material and favorable evidence, even when the Government believes that it has evidence to the contrary" [*Id*. at 5]. He contends that the Government must prove the specific Individuals 1–6 were harbored and were illegally in the country [*id*. at 6], and asserts that "based on the current allegations, that [he] did not know, did not have interaction with, or had limited interaction with any of the removed witnesses" [*id*. at 7]. Defendant also argues that the time of arrest and processing for at least three of Individuals 1–6 shows they were not in the basement referenced by the Government in the detention hearing [*Id*. at 8]. He maintains that while the Government purports to be able to prove the alienage of Individuals 1–6 through the A-Files, "the immigration court['s] conclusions that the individuals were here unlawfully alone cannot prove this element beyond a reasonable doubt," and other portions of the A-Files, such as one individual's asylum status, are favorable to him [*Id*.]. Defendant contends that without the testimony of Individuals 1–6, he is deprived of his right to present exculpatory evidence [*Id*. at 9].

On September 9, 2026, the parties appeared before the undersigned for a motion hearing on Defendants' pending motions. All three Defendants were present. Assistant United States Attorneys David P. Lewen, Jr., and Russ Swafford appeared on behalf of the Government. Attorneys Wade V. Davies and Georgia A. Miller represented Defendant Wells. Attorneys David

M. Eldridge, Loretta G. Cravens, and Sharon Leveron represented Defendant Bonilla-Servin, and Attorney Robert R. Kurtz represented Defendant Bonilla-Serna, who participated with the aid of an interpreter.

At the motion hearing, Mr. Davies argued that the Court should dismiss the indictment because the Government has deprived Defendant Wells of important material evidence, i.e., the testimony of Individuals 1–6. He asserted that law enforcement arrested Individuals 1–6 on January 13, 2026, and interviewed them. He introduced the notes of those six interviews as Collective Exhibit 1. Mr. Davies maintained that those notes show Individuals 1–6 are material witnesses. He asserted that the Government indicted Defendant Wells with a conspiracy count and six counts of harboring illegal aliens, all of which specifically reference one or more of Individuals 1–6. Mr. Davies alleged that after interviewing these individuals, referencing them in the indictment, and referring to them as material witnesses in the detention proceedings, the Government removed them or facilitated their voluntary departure without providing a meaningful opportunity for Defendant Wells to investigate and preserve their testimony.

Mr. Davies argued that the defense has shown the Government acted in bad faith because it recognized the materiality of the witnesses and yet facilitated their voluntary departure or removal. He asserted that bad faith does not require the defense to show intentional misconduct. As for the Government's argument that a different agency facilitated the departure of Individuals 1–6, Mr. Davies asserted that the DOJ identified these individuals as material witnesses and the DOJ is responsible for obtaining information from the investigating agencies.

Mr. Davies also argued that Defendant Wells has given a plausible account of the events to which Individuals 1–6 could testify and why those events matter to the charged offenses. He contends that Exhibit 1 shows that none of the six witnesses mentioned Defendant Wells in

describing their work history or how they arrived at the jobsite that day. He said the six witnesses were employed by subcontractors and not by Defendant Wells or his employer. Mr. Davies argued that some of the witnesses had aliases and were working under a different name, which is material and favorable to whether Defendant Wells knew their immigration status. He asserted that some of Individuals 1–6 were arrested early in the events of January 13 and could not have been the persons who allegedly fled into an adjacent neighborhood. He said one of the six could not be identified by the government of Guatemala and a couple of the witnesses worked for a subcontractor from a time before Defendant Wells was employed at that jobsite.

Mr. Davies asserted that the ability to interview Individuals 1–6 goes to the core elements of the charges. He asserts the Government's theory is that Defendant Wells warned the workers fleeing the site on January 13, but most people on the construction site learned of law enforcement's presence from the sirens that the officers activated after the contact between the ICE vehicle at the gate and another vehicle. Mr. Davies argued that because of the Government's removal of these witnesses, he cannot ask them whether they left the site because of anything Defendant Wells did. Nor can he inquire whether the witnesses misrepresented to the subcontractors who employed them that they were lawful workers.

Mr. Kurtz relied on Mr. Davies' arguments regarding bad faith but argued that the testimony of the missing witnesses is crucial with regard to Defendant Bonilla-Serna's involvement in the case. He maintained the discovery does not indicate that Defendant Bonilla-Serna was at the construction site on January 13, on any of the other specific dates when individuals were arrested, or ever. He also asserted that none of the missing witnesses identified Defendant Bonilla-Serna as their employer. Mr. Kurtz said if Individuals 1–6 were available, he would have questioned them about whether they ever had direct or indirect contact with Defendant Bonilla-

Serna and how long they had been employed at the Hardin Valley jobsite. He believes the witnesses would testify that they never had contact with Defendant Bonilla-Serna, did not know him, and had never seen him nor knew anything of him. He stated that the departure of these witnesses prevents Defendant Bonilla-Serna from rebutting the Government's contentions about Individuals 1–6.

Mr. Eldridge adopted the arguments of Mr. Davies and Mr. Kurtz and also argued that Individuals 1–6 would testify that they had no contact with Defendant Bonilla-Servin, who was employed by Defendant Bonilla-Serna's company. He asserted that the witnesses would state that they had no interactions with Defendant Bonilla-Servin related to harboring and that Defendant Bonilla-Servin did not communicate with them in any way.

AUSA Swafford argued that Defendants' arguments about the DOJ facilitating the removal of Individuals 1–6 are based on their misconception about the structure and division of authority in the executive branch. He stated that in 2002, Congress transferred the enforcement of immigration laws from the Attorney General to the Secretary of Homeland Security. AUSA Swafford maintained that, thus, it was the Department of Homeland Security and ICE that deported or consented to the voluntary removal of Individuals 1–6, not the DOJ. He asserted that the Department of Homeland Security, a separate agency, acting under separate authority and following the immigration laws cannot constitute bad faith. AUSA Swafford pointed out that here Individuals 1–6 asked to leave and left at their own expense. He stated that because Defendants' motion fails the first *Damra* prong, the Court need not reach the second.

AUSA Swafford further asserted that if the Court were to consider the second prong, Defendants' arguments still fail. He stated that harboring does not require that the witness be a direct employee of Defendants, but here, Defendant Wells texted that he would keep the workers

safe and to "go to war" for them. AUSA Swafford argued that, likewise, the individuals' use of an alias does not affect the Defendants' knowledge of their alienage. He maintained that if Individuals 1–6 were called to testify, they could assert the Fifth Amendment protection against self-incrimination, despite being aliens.

Mr. Davies responded that the Government has known since January 13 that officers interviewed Individuals 1–6 to use them in a criminal case against Defendant Wells. He contended the fact that these individuals did not work for Defendant Wells goes to several elements that the Government must prove, including whether he knew these specific individuals were "illegal aliens." He emphasized that none of the individuals stated in their January 13 interview that they were harbored or aided by Defendant Wells. Nor does the aiding and abetting charge change the materiality of these witnesses. Mr. Davies argued that both the conspiracy count and the substantive counts of harboring require that Defendant Wells knew or recklessly disregarded that Individuals 1–6 were in the United States in violation of federal law. He said although the Government claims Defendant Wells is a leader and protected Individuals 1–6, the fact that they did not name him in their interviews refutes that assertion and is exculpatory. Mr. Davies asserted that not having the testimony of Individuals 1–6 makes it impossible for the defense to show the jury the truth about Defendant Wells's role as to these six people he is charged with harboring. He argued that Homeland Security is the prosecuting and investigating agency in this case and, thus, it is the United States government that facilitated the removal of Individuals 1–6.

Mr. Kurtz argued the Government must prove that defendants charged with aiding and abetting at least knew the principal goal of the offense from the time of their involvement in the offense going forward. He maintained that if the primary offender did not know the legal status of

Individuals 1–6 or know of their presence on the site, then that knowledge cannot be imputed to those purportedly aiding and abetting.

Mr. Eldridge responded that on January 13 and in the weeks and months after that, the identities of Individuals 1–6 were known only to the arresting officers and the prosecution in this case. He maintained that the prosecution could have taken steps to obviate this issue, such as seeking a material witness warrant and/or seeking to take the depositions of these witnesses. Mr. Eldridge argued that the Government alleged these witnesses were in his country illegally and, thus, knew a substantial chance existed that these witnesses would not be here for trial or for the defense to interview. He stated that this shows the Government's bad faith.

The Court questioned AUSA Swafford about Mr. Eldridge's argument that bad faith is shown because the prosecution knew the identity of Individuals 1–6 before another agency addressed their voluntary requests for removal and could have taken steps to preserve the individuals' testimony knowing its potential relevance. Mr. Swafford responded that the prosecution did know the identity of the individuals but does not have the authority to tell another executive agency what they can or cannot do. He maintained that when another agency is enforcing the laws that Congress has authorized it to enforce, the prosecution cannot stop an administrative removal, especially when it is voluntary. Regarding the materiality of the individuals' testimony on why they left the site, AUSA Swafford argued that Defendant Wells's conduct, as illustrated by his text messages, shows a pattern and practice of having people flee when law enforcement comes to the site. He argued that the identity of Individuals 1–6 is not an element of the conspiracy count, and the individuals do not have to be present for the Government to prove the substantive counts of harboring.

Mr. Davies responded that the substantive counts charge Defendants with harboring specific individuals and that without those individuals present to testify, Defendants have no way to show the jury that is not true.

Mr. Eldridge responded that the Government is statutorily authorized to seek a warrant to hold a material witness and if such warrant is issued, then it would be the Court's order, not the prosecution's direction, requiring the material witness to be held until the witness's testimony could be preserved.

AUSA Lewen argued that Defendant Wells's text messages warning that ICE was present and Defendant Bonilla-Servin's actions in blockading and ramming the officers' vehicle caused twenty to thirty people, including Individuals 1–6, to flee the site on January 13. He asserted that Defendant Wells controlled the site and harbored illegal aliens by knowingly employing and shielding them. AUSA Lewen denied that Individuals 1–6 would have any testimony favorable to Defendants. He argued that no one contests that Individuals 1–6 were on the construction site and fled the site that Wells controlled. AUSA Lewen said Defendant Wells's texts and conduct show a pattern and practice of clearing illegal employees from the site since the preceding December even though he did not know their names.

Mr. Davies responded that the questions to Individuals 1–6 on January 13, such as who drove them to the jobsite and about their background, show that law enforcement was investigating more than the collision at the gate. He stated the Government must prove the reasons for Individuals 1–6 leaving the site on January 13, whether that be that Defendant Wells warned them or that they heard a siren. Mr. Davies argued that the Defendants should have the ability to investigate the case and to present the truth to the jury, and they do not because the Government has removed the witnesses.

After hearing the parties' arguments on the motion, the Court took the matter under advisement.

## II. ANALYSIS

"In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. amend. VI. Defendants argue that the Government has violated their right to compulsory process by deporting or permitting the voluntary departure of Individuals 1–6, the six aliens whom they are accused of harboring and conspiring to harbor.[2] The fact that a witness is deported is by itself insufficient to demonstrate a compulsory process violation. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). In the Sixth Circuit, to determine whether the removal of Individuals 1–6 violates Defendants' constitutional rights, the Court must employ a two-prong test: "a defendant must first make an initial showing that the government has acted in bad faith, and, having made that showing, must then make some plausible showing that the testimony of the deported witness would have been both material and favorable to his defense." *United States v. Damra*, 621 F.3d 474, 489–90 (6th Cir. 2010) 489–90 (footnote and citations omitted). At bottom, no sanction, including dismissal of the indictment, is warranted, unless there exists "a reasonable likelihood that the

---

[2] Defendant Wells states his claims are pursuant to the Due Process Clause of the Fifth Amendment as well as the Compulsory Process Clause of the Sixth Amendment [Doc. 113 p. 1]. The primary cases on the deportation of an alien witness provide analysis grounded in both the right to compulsory process and the right to due process. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982) ("Having borrowed much of our reasoning with respect to the Compulsory Process Clause of the Sixth Amendment from cases involving the Due Process Clause of the Fifth Amendment, we have little difficulty holding that at least the same materiality requirement obtains with respect to a due process claim."); *United States v. Damra*, 621 F.3d 474, 489 (6th Cir. 2010) (observing that the loss of a deported witness implicates "the area of constitutionally guaranteed access to evidence" arising out of due process (citation omitted)). Thus, the undersigned addresses due process by analyzing the Defendants' compulsory process arguments. Any due process arguments that are separate from the compulsory process arguments are undeveloped; the undersigned therefore does not consider them.

testimony could have affected the judgment of the trier of fact." *Id.* at 490 (quoting *Valenzuela-Bernal*, 458 U.S. at 874).

**A. Bad Faith**[3]

Defendants assert that the Government acted in bad faith because it recognized Individuals 1–6 are material to the case, yet it deported them or consented to their voluntary departure without taking any steps to preserve their testimony. The Government counters that it is not responsible for the witnesses' absence and that Individuals 1–6 are material to the prosecution, not the defense.

While the Sixth Circuit has not defined "bad faith" in the context of deporting a potential witness, the Ninth Circuit[4] finds bad faith is demonstrated if (1) "the Government departed from normal deportation procedures," or (2) it deported the witness "to gain an unfair tactical advantage . . . at trial." *United States v. Burke*, No. 1:16-cr-20625, 2017 WL 3616576, at *7 (E.D. Mich. Aug. 23, 2017) (quoting *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1085 (9th Cir. 2000)); *see also California v. Trombetta*, 467 U.S. 479, 488 (1984) (observing law enforcement did not act in bad faith in failing to preserve exculpatory evidence because the defendant demonstrated "no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence"); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000) (defining "bad faith" as where the Government deports a potential witness with "official animus"

---

[3] Defendant Wells argues that *Damra*'s addition of a bad faith prong exceeds the requirements of the Supreme Court in *Valenzuela-Bernal*. But *Damra* is binding on this Court, so the undersigned follows it here and addresses bad faith.

[4] The Sixth Circuit followed the Second, Seventh, Ninth, and Tenth Circuits when finding that "any defendant arguing violation of his right of compulsory process . . . [must] show that the government acted in bad faith . . . ." *Damra*, 621 F.3d at 489 (citations omitted).

toward the defendant or in "a conscious effort to suppress exculpatory evidence" (citations and footnote omitted)).

Nothing suggests a failure to follow normal deportation procedures here. "[T]he responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution." *Valenzuela-Bernal*, 458 U.S. at 872. The Government explained at the motion hearing that the deportation and voluntary departure of aliens not lawfully in the country is under the authority of the Department of Homeland Security, not the Attorney General. Defendants argue that regardless of which agency authorized the voluntary departure or removal of Individuals 1–6, both the prosecuting and investigating agencies had a duty to preserve the evidence, including testimony, in this case. In this regard, they assert that an HSI agent interviewed Individuals 1–6 on the day of their arrest. But the notes from these interviews do not show the arrestees provided information exculpatory to the Defendants [*See* Exh. 1].

Nor have Defendants shown that Individuals 1–6 were removed to give the Government a tactical advantage or due to some official animus or conscious effort to suppress exculpatory evidence on the part of the Government. Defendants argue that the prosecutor's statements at Defendant Wells's detention proceedings show the Government recognized Individuals 1–6 are material to the defense before they were deported. But a review of the transcript of the January 27, 2026 detention hearing shows that the Government argued the individuals who fled the

construction site were material to its own case [*See* Doc. 37 pp. 7–8,[5] 25[6] & 36[7]]. At one point in the proceedings, the prosecutor acknowledged that Defendant Wells may try to raise a defense that he did not know the employees of subcontractors were not lawfully in the country, but he asserted that any such defense would be "bogus" based upon Defendant Wells's text messages indicating he would protect the workers from ICE officers [*See* Doc. 37 p. 16[8]]. These comments in Defendant Wells's detention hearing do not show that the Government knew Individuals 1–6 possessed any exculpatory or material evidence for the defense.

At the motion hearing, counsel for Defendant Bonilla-Servin argued that the Government knew Individuals 1–6 were likely to be deported and should have taken steps to preserve their testimony such as applying for material witness warrants or seeking to depose them. The Sixth

---

[5] AUSA Lewen stated, "All of these individuals that [Defendant Wells is] causing to disappear are material witnesses and he knows that. That's active obstruction, not only generally in investigations but in this Court's prosecution or the government's prosecution of this case before this Court" [Doc. 37 pp. 7–8].

[6] Reading Defendant Wells's text messages from January 13, 2026, AUSA Lewen stated, "Wells, 'Do you know if anybody else got away?' Person 11, "I don't know man.' Wells, 'Hey, are you missing two guys?' Material witnesses, Your Honor. Person 11, 'Yes 2 guys don't answer the phone'" [Doc. 37 pp. 24–25].

[7] AUSA Lewen states that he has not reviewed all of Defendant Wells's test messages, "but what we do know is that he actively in the days leading up to him being charged, he was disappearing witnesses, disappearing people. And if you hide material witnesses, you don't need to corruptly persuade them to testify falsely or to testify in a certain way" [Doc. 37 p. 36].

[8] AUSA Lewen states "Wells tells his subordinate, (as read) 'I hope they do know I will not let them get taken.' Don't have to be an immigration expert to understand the freight that is on that statement. They, the illegals, he knows they're illegal, so this excuse of, hey, I just hire the subcontractors and they hire their employees and I don't know anything about them, I trust the subcontractors, I'm sure that's some kind of defense that will probably surface at some point, bogus. I hope these illegals know that I, Tyler Wells, the general contractor, the leader/organizer of this harboring conspiracy will not let them, those illegals get taken by federal law enforcement" [Doc. 37 pp. 16–17].

Circuit does not impose such a duty on the prosecution, particularly in the absence of knowledge that the witnesses possessed exculpatory information. *See Damra*, 621 F.3d at 489–90 (placing the duty to show both bad faith and that the witness was both material and favorable on the defendant); *Burke*, 2017 WL 3616576, *7–8 (holding a requirement that the prosecution must treat an alien with potentially exculpatory evidence as a material witness subverts the test established in *Damra*); *see also United States v. Gonzalez-Perez*, 573 F. App'x 771, 777 (10th Cir. 2014) ("A per se rule requiring the government to always detain alien witnesses with potentially exculpatory information unduly interferes with the immigration laws enacted and to be executed by the political branches [and] . . . essentially presumes bad faith on the part of the government."). Requiring the Government to detain all potentially material alien witnesses erases any "meaningful distinction" between the two prongs of the *Damra* test. *Burke*, 2017 WL 3616576, *8. "Every time a defendant could show that the deported witness had material information (which the Government is aware of), then bad faith would be presumed." *Id.*[9]

In sum, neither the post-arrest statements of Individuals 1–6 nor the prosecution's comments at Defendant Wells's detention hearing show that the Government was aware Individuals 1–6 could provide exculpatory or material evidence for the defense. The undersigned has no evidence before her that the immigration authorities failed to follow normal procedures for removal or voluntary departure of Individuals 1–6. Nor is there any evidence of official animus or conscious effort to suppress exculpatory evidence on the part of the Government. Accordingly, Defendants cannot carry their burden to make the necessary threshold showing of bad faith.

[9] Defendants Wells and Bonilla-Servin also could have sought to preserve the testimony of the six individuals arrested on January 13, 2026, pursuant to Rule 15(a)(1) of the Federal Rules of Criminal Procedure.

### B. Material and Favorable Testimony

Even if Defendants could demonstrate bad faith on the part of the Government in removing Individuals 1–6, *Damra* also requires Defendants to make a "plausible showing that the testimony of the deported witness[es] would have been both material and favorable to his defense." 621 F.3d at 490. "Whether the defendant had an opportunity to interview th[e] witness before deportation is relevant, but not dispositive, to the materiality and favorability determination; the defendant must demonstrate materiality and favorability either by some plausible avowal of how a witness may testify, or else by a plausible description of 'the events to which a witness might testify, and the relevance of those events to the crime charged.'" *Id*. (quoting *Valenzuela–Bernal*, 458 U.S. at 868); *see also Valenzuela-Bernal*, 458 U.S. at 871 (recognizing the materiality showing is "difficult" but not "impossible" for a defendant who never interviewed the deported witness). In making a plausible showing of the deported witness's testimony, "the defendant's unsupported word alone is not sufficient to demonstrate materiality and favorability where the defendant maintains only that the potential witness 'could explain' or 'might have testified' in some favorable fashion." *Damra*, 621 F.3d at 490 (citing *United States v. Iribe–Perez*, 129 F.3d 1167, 1173 (10th Cir. 1997)).

Defendants argue the post-arrest statements of Individuals 1–6 show they would have testified that they were not employed by Defendants Wells or Bonilla-Serna, did not know the Defendants, and perhaps falsely told the subcontractors who employed them that they were lawfully in the United States. The undersigned questions whether this testimony would be material because it seems likely cumulative to the testimony of other, available witnesses. *See Burke*, 2017 WL 3616576, at *9 (finding the defendants failed to show testimony of deported witnesses would have been material and favorable where they "made no effort to explain what non-

cumulative information the unavailable witnesses could provide"); *see also Valenzuela-Bernal*, 458 U.S. at 873 (explaining that a defendant has the burden to make a "plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses"). As an example, the subcontractors who employed the six arrested individuals could testify regarding their employment of Individuals 1–6 and about any aliases and documentation or lack thereof provided upon employment.

At the motion hearing, counsel for Defendant Wells stated that Individuals 1–6 could have testified about why they fled the construction site, whether it was because he warned them as the Government claims or because they heard the sirens of the officers at the gate. Defendant Wells argued that this potential testimony is relevant to the central question of whether he harbored Individuals 1–6. But Defendant Wells's suggestion that these individuals might testify that he did not warn them is not sufficient to show materiality. *See Damra*, 621 F.3d at 490 (finding the defendant failed to show his deported brother's testimony would have been material and favorable "because [defendant] can offer nothing apart from his unsupported (and implausible) claim" of how his brother "could have" testified); *see also Iribe-Perez*, 129 F.3d at 1173 (observing a plausible showing of material testimony "requires more than the mere potential for favorable testimony . . . and [defendant] has not offered any credible reason to believe that [his brother who was granted a voluntary departure] would in fact provide exculpatory testimony").

In sum, for this requirement, the undersigned questions whether Defendants can demonstrate that the testimony of Individuals 1–6 would be favorable, material, and non-

cumulative. But the undersigned recommends that the District Judge deny the motion to dismiss because Defendants have not carried their burden to make the necessary showing of bad faith.[10]

## III. CONCLUSION

For the reasons explained herein, the undersigned respectfully **RECOMMENDS** that the District Judge **GRANT** Defendants Bonilla-Servin's [**Doc. 119**] and Bonilla-Serna's [**Doc. 160**] requests to adopt the motion to dismiss and **DENY** Defendants' joint Motion to Dismiss for Violations of the Due Process and Compulsory Process Clauses [**Doc. 113**].[11]

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[10] The Supreme Court has stated that "[b]ecause determinations of materiality are often best made in light of all of the evidence adduced at trial, judges may wish to defer ruling on motions until after the presentation of evidence." *Valenzuela-Bernal*, 458 U.S. at 874 (footnote omitted). The undersigned does not find that appropriate here because Defendants have failed to show bad faith.

[11] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Judge need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).